No. 53,747

IN THE INTEREST OF EVA WOODARD, a Minor Under 18 Years of Age.

(646 P.2d 1105)

Opinion filed June 11, 1982.

*Van Smith,* of Smith Law Office, of Garden City, argued the cause, and *Jay C. Hinkel,* of the same firm, was with him on the brief for appellant.

*John Wheeler,* of Soldner & Wheeler, of Garden City, guardian ad litem, argued the cause, and *Robert T. Stephan,* attorney general, *Paul D. Handy,* county attorney, and *Denise Grimes,* assistant county attorney, were with him on the brief for appellee.

*Philip C. Vieux,* of Owen & Vieux, of Garden City, was on the brief *amicus curiae.*

The opinion of the court was delivered by

HOLMES, J.: Steve Woodard appeals from an order of the district court denying his motion to set aside a prior order of the court which severed his parental rights to his illegitimate daughter, Eva Woodard. In the original severance proceeding the only service upon appellant, a California resident, was by publication notice in The Garden City Telegram. When Woodard learned, some ten months later, that his parental rights to Eva had been severed, he took immediate steps to set aside the order of severance. His motion was denied by the district magistrate judge for failure to take a timely appeal and that ruling was upheld upon appeal by the district judge.

Eva Woodard was born August 26, 1978, in Ukiah, California, the daughter of Caroline Pickett and Steve Woodard. Although Caroline and Steve had lived together for a considerable length of time, they were never legally married. Sometime after the birth of Eva, Caroline and the baby departed from California without informing Woodard and he evidently had no knowledge of their subsequent whereabouts. In the spring and summer of 1979, Caroline and Eva were in Garden City, Kansas, where Eva was left in the care of a day-care provider on several occasions. Caroline was quite negligent about returning to pick up the baby and on one occasion left the baby with Mrs. Nowak, the day-care provider, for nearly five weeks without checking on the child. Mrs. Nowak eventually became concerned about the neglect of the child and on August 15, 1979, contacted the Department of Social and Rehabilitation Services (SRS). After an investigation by an SRS social worker, and after interviewing Caroline, SRS

filed a petition on October 1, 1979, seeking to have Eva declared a deprived child. The petition alleged the father was unknown and on the same date the court issued an order of protective custody committing Eva to SRS and temporarily placing the child with Mr. and Mrs. Nowak. Caroline has shown very little interest in the child or in the court proceedings and has not appealed any of the lower court's orders.

On October 29, 1979, on oral motion of the county attorney's office, an order was entered authorizing the filing of an amended petition to seek severance of the parental rights of both parents. The amended petition, filed November 20, 1979, named Steve Woodard as the father but asserted that the whereabouts of the father were unknown. In an order filed the previous day Mr. Van Smith, a respected member of the bar of Kansas, was appointed to represent Steve Woodard. A guardian ad litem for Eva had been appointed since the outset of the proceedings and the mother was also represented by appointed counsel. The publication notice directed to "Steve Woodard and all other persons who are or may be concerned" was published November 29 and December 6, 1979, in The Garden City Telegram and advised that the petition for severance of parental rights would be heard by the court on January 22, 1980, at 9:00 o'clock a.m. On October 30, 1979, the court had apparently entered another order based upon a motion of the deputy county attorney, seeking to amend the petition and seeking service upon Steve Woodard by publication. This order, which was not filed until December 18, 1979, appears to be based upon an undated motion filed November 16, 1979, some seventeen days after the court ruled on the motion. In the motion of the deputy county attorney it is alleged, "The movant further prays that the Court shall allow it to serve notice upon Steve Woodard by publication, for the reason that after due diligence the movant is unable to ascertain the whereabouts of said Steve Woodard." Based upon this November 16, 1979, motion the court order of October 30, 1979, states:

"5. The presence as a party in this matter of Steve Woodard, natural father of Eva Woodard, is essential. Due to the unknown whereabouts of said Steve Woodard, service by publication as per K.S.A. 1978 Supplement 38-810a is proper."

There are no findings of fact as to the attempt made, if any, to locate the father and no showing or finding of due diligence is contained in the order. It is interesting to note that the court's

order was originally dated November 30, 1979, which would have been appropriate considering the motion was filed November 16, 1979. However, it soon became apparent to someone that there was a problem in that the first publication was November 29, 1979, one day prior to the order authorizing such service. Evidently alert counsel recognized the problem and crossed out November and inserted October in the order, which resulted in the order predating the motion upon which the order was based. Whether these procedural gymnastics were an after the fact attempt to clean up what is a woefully inadequate record we do not know. Despite the many procedural inaccuracies it appears that the severance hearing was heard by the court on the appointed date, January 22, 1980. Steve Woodard was represented by his counsel Mr. Van Smith, Eva Woodard by her guardian ad litem, and Caroline Pickett by her appointed counsel. Findings of fact and conclusions of law were filed February 28, 1980, and a journal entry of judgment was filed March 12, 1980.

In its findings of fact the court found that Eva was born August 26, 1977, and that Steve Woodard had failed to provide any parental support for at least two years. Eva was actually born August 26, 1978, and was less than seventeen months old at the time of the hearing. In fairness to the trial judge, it should be pointed out that the court may have been misled by the proposed findings of fact, filed by the deputy county attorney, which contained these inaccuracies. In its conclusions of law, the court found that Eva was a deprived child and that the parental rights of Caroline Pickett and Steve Woodard should be permanently severed. In the journal entry of judgment the court incorporated the findings of fact and conclusions of law previously filed and in addition found:

"3. The Court finds that the parental rights of Carolyn Pickett and Steve Woodard, natural mother and natural father of Eva Woodard should permanently and totally severed in that the said natural parents are found by the Court to be unfit parents and not proper persons to have the care, custody and control of the said child, Eva Woodard."

No appeal was ever taken from the January 2, 1980, order. Shortly before October 20, 1980, Caroline wrote to Steve and advised him she no longer had the baby and that it had been taken from her in court proceedings. He immediately contacted the county attorney and was advised to call his appointed counsel Van Smith. On

October 20, 1980, Mr. Smith, at Woodard's request, filed a motion to set aside the order of January 22, 1980, and to restore Woodard's parental rights. Woodard alleges Caroline testified falsely about her lack of knowledge of his whereabouts and that the court did not obtain jurisdiction as the publication notice did not constitute service of summons as required by K.S.A. 38-820. On November 18, 1980, a hearing was held before the district magistrate judge. Steve Woodard was present in person, having traveled from California, for the hearing. The trial court ruled that Woodard would be denied the right to present evidence or a proffer of evidence and, after hearing legal arguments, denied the motion to set aside the prior order and thereby reopen the proceedings. The ruling of the magistrate judge was appealed to the district judge who requested briefs from counsel and, after receiving briefs, rendered a memorandum decision which, after reviewing the facts, reads, in part:

"Issue: It must be conceded that if the Court had jurisdiction to sever the parental rights of Steve Woodard on January 22, 1980, the appeal is moot in that Steve Woodard did not timely appeal the court's findings of deprived child and severance of his parental rights. However, if the Court was without jurisdiction on January 22, 1980, did the Court err in overruling the natural father's motion to set aside that Journal Entry?

"Conclusions:

"The Court must construe the facts in light of the following statutes: KSA 38-810a, 1979 Supp.; KSA 38-820, 1979 Supp.; KSA 38-1303, 1979 Supp.; KSA 38-1305, 1979 Supp.; and Kansas Appellate decisions construing these statutes.

"KSA 38-820 is very clear; that is, before a parent's rights may be severed he must be represented by counsel and personally present or have been served with summons. In the matter now before the Court the natural father, Steve Woodard, was represented throughout by Van Smith, court-appointed counsel. It must be conceded that Steve Woodard did not personally appear in any of the proceedings prior to the Court's ruling of January 22, 1980. Therefore, the only question to be resolved is whether the natural father, Steve Woodard, had been served with summons.

"KSA 38-810a states: '.  .  .  . (a) All summons, notices and other process of the court for proceedings pursuant to the juvenile code shall be served in accordance with this section.  .  .  . (b) The Court shall direct the method of service of summons, notice of hearings and other process from the following applicable alternatives:

.  .  .  . (4) *Service by Publication.* Service by publication is completed by publishing a copy of the process once a week for two consecutive weeks in some newspaper authorized to publish legal notices;  .  .  .' It must be conceded that the publication was in proper form as there has never been an objection as to form or an appeal perfected questioning the form of publication.

"The natural father, Steve Woodard, argues the service of summons by publication is improper in that personal service, residential service or restricted mail service must first be attempted unsuccessfully. A close reading of KSA 38-810a in no way mandates nor warrants such an interpretation. The statute leaves to the Court the manner of service and vests the manner solely in the Court's discretion. The statute further states: '. . . (d) When personal service or residential service of process is directed, such process shall be served by a juvenile probation officer, the sheriff or any other person appointed by the Court for such purpose. . . .'

"In the matter now before the Court the order of October 30, 1980 [sic 1979) ], directed that service of summons be effectuated on the natural father, Steve Woodard, by publication. Once again no appeal was taken from that order.

"However, KSA 38-820 and KSA 38-810a must be construed in light of and in harmony with KSA 38-1303(a)(3) and KSA 38-1305(a)(1) through (4). KSA 38-1303(a)(3)(A) is explicit as to when a court may exercise its jurisdiction as to custody of children. In the matter before the Court it was alleged that the minor child had been abandoned on more than one occasion with the Day Care Provider. At the time the Court entered its initial order of custody the name of the natural father was unknown and when the final order severing parental rights and custody was entered the Court had determined the whereabouts of the natural father, Steve Woodard, was unknown and directed service of summons by publication in its order of October 30, 1980 [sic, 1979]; thus, compliance with KSA 38-1305(a)(4).

"The Court thus finds and concludes that on January 22, 1980, the Court had jurisdiction over the subject matter; i.e. the minor child; jurisdiction over the natural mother, Carolyn Pickett, and the natural father, Steve Woodard. To find otherwise would result in the juvenile code as adopted by our legislature being but a shell. Although the rights of parents should be jealously guarded they must be weighed against the rights of the child to a full and rich life with his natural parents or adoptive parents. In the matter before the Court there was no effort by the natural father to locate his child until approximately ten months after the Court's order severing his rights. If this Court was to rule otherwise would, in effect, cause children to always be in a state of uncertainty.

"The Court further finds that applicable decisions of Kansas' appellate courts support his ruling and there has been no violation of Steve Woodard's rights to due process.

"Therefore, the finding of the District Magistrate on November 18, 1980, overruling the natural father's motion to set aside the Journal Entry of January 22, 1980, was correct. The natural father, Steve Woodard, failed to timely appeal the Court's order of January 22, 1980, and therefore the issues raised on the appeal are moot."

Steve Woodard has appealed the district court's order and the case was transferred from the Court of Appeals to the Supreme Court pursuant to K.S.A. 20-3018(c). While appellant concedes that the procedure of the juvenile code was formally complied with and that publication service is valid in some severance cases, he asserts it was insufficient in the present case as there is no showing of what efforts were used to attempt to locate him so that

actual notice could be given. It is further the position of the appellant that publication service can only be valid when it is shown that due diligence was used to effect a means of service that would provide actual notice.

On the other hand, the State and *amicus curiae* (the former deputy county attorney who handled all the proceedings at the trial court level) argue that the statute, K.S.A. 38-810a, makes no requirements that precede the utilization of service by publication and that the decision as to the type of service rests solely in the discretion of the trial court. It is also contended that inasmuch as the juvenile code establishes its own complete procedure, separate and apart from the code of civil procedure (*In re Waterman,* 212 Kan. 826, Syl. ¶ 3, 512 P.2d 466 [1973]), that appellant's only remedy in this case was to appeal the trial court's January 22, 1980, order within thirty days pursuant to K.S.A. 38-834. We agree with the position of the appellant.

The pertinent statutes have been summarized and sufficiently set forth in the trial court's opinion quoted above and need not be repeated. Suffice it to say the trial court did have jurisdiction to enter appropriate custody orders for the protection of Eva. K.S.A. 38-1303. The serious question before this court is whether the court had jurisdiction to sever parental rights based upon constructive service by publication when the record does not reflect the need for resorting to such service. Unfortunately, the record does not include a transcript of the January 22, 1980, proceedings which might show the exercise of due diligence on the part of the State in attempting to locate appellant.

The United States Supreme Court and our own state appellate courts have recognized repeatedly that parental rights are fundamental, substantive rights not to be meddled with absent a compelling countervailing protection interest. See *Stanley v. Illinois,* 405 U.S. 645, 31 L.Ed.2d 551, 92 S.Ct. 1208 (1972); *In re Cooper,* 230 Kan. 57, 631 P.2d 632 (1981); *Sheppard v. Sheppard,* 230 Kan. 146, 630 P.2d 1121 (1981); *In re Lathrop,* 2 Kan. App. 2d 90, 575 P.2d 894 (1978).

On the other hand, the State's parens patriae interest in protecting the welfare of its children must take precedence over the rights of the parents when the welfare of the child requires such a determination. In *Cooper,* Justice Fromme summarized the balancing of the child's welfare against the parents' rights as follows:

"This court has long recognized the State's interest in protecting its children and assuring they receive proper care. *State ex rel. O'Sullivan v. Heart Ministries, Inc.,* 227 Kan. at 253; *Murphy v. Murphy,* 196 Kan. 118, 122, 410 P.2d 252 (1966). In the State's exercise of its parens patriae powers, the child's best interests are always the paramount consideration. *In re Nelson,* 216 Kan. 271, 276, 531 P.2d 48 (1975); *In re Wheeler,* 3 Kan. App. 2d 701, 703, 601 P.2d 15, *rev. denied* 227 Kan. 927 (1979). The parents' rights cannot be disregarded, however, and the child's best interests may be considered in conjunction with the parents' rights. *In re Armentrout,* 207 Kan. 366, 370, 485 P.2d 183 (1971); *Lennon v. State,* 193 Kan. 685, 691, 396 P.2d 290 (1964). The parents' rights are subordinate to the State's parens patriae powers and must yield when adverse to the best interests of the child. *State v. Garber,* 197 Kan. 567, 572, 419 P.2d 896 (1966); *Lennon v. State,* 193 Kan. at 691. It is presumed that the best interests of the child are served by the retention of the child's custody in the natural parents. *In re Armentrout,* 207 Kan. 366. Judicial recognition and legal representation of a parent's interests in a child-deprivation proceeding does not, therefore, usurp the State's parens patriae powers." pp. 62-63.

However, the exercise of the parens patriae doctrine does not extend to the extreme of severing parental rights without a good faith effort to locate and notify the parents who are to be affected by the court's determination.

In another juvenile proceeding, albeit of a criminal nature, the United States Supreme Court said that where the child's future and the parent's right to control and raise that child were at stake,

"Due process of law requires notice of the sort we have described — that is, notice which would be deemed constitutionally adequate in a civil or criminal proceeding." *In re Gault,* 387 U.S. 1, 33, 18 L.Ed.2d 527, 87 S.Ct. 1428 (1967).

While it is true that our juvenile code sets up a complete and exclusive procedure, it is not unreasonable to look to our code of civil procedure and our decisions in other types of civil cases to determine the requirements of valid constructive service. It would seem only logical that due process of law would require at least comparable safeguards in a proceeding in which a parent might lose his or her child as would be required if that same person was a party to an action in which the loss of money or property was at stake. Fundamental fairness, which is the benchmark of due process, requires nothing less.

In *Chapin v. Aylward,* 204 Kan. 448, 464 P.2d 177 (1970), this court considered the validity of constructive service by publication in a tax foreclosure action. Without going into detail as to the facts of the case, it was apparent that the owners of the mineral

interests being foreclosed were not residents of the county and all the procedural requirements of the statutes for publication service appeared to be in order. It appears that the owners' names and addresses were, however, readily available to the foreclosing officials. In affirming the trial court's decision setting aside the tax sale this court stated:

"In *Walker v. City of Hutchinson,* 178 Kan. 263, 284 P.2d 1073, the city condemned a part of Walker's property for street purposes. The appraisers who were appointed to determine compensation were required by statute to give at least 10 days notice of their proceedings either in writing or by one publication in the official city paper. They chose the latter method of giving notice. Walker later sought an injunction to prevent the alleged trespass on his property alleging that he had not been notified of the proceedings, knew nothing of them, and that the publication notice was insufficient to satisfy the Fourteenth Amendment's requirements of due process. The trial court denied relief. On appeal, this court affirmed - holding that the notice by publication did not deprive him of due process of law.

"Upon appeal to the supreme court of the United States that court reversed (*Walker v. Hutchinson City,* 352 U S 112, 1 L. ed 2nd 178, 77 S Ct 200) and held that the newspaper publication alone was not adequate notice as required by due process, where, as the facts showed, the owner's (Walker's) name was known to the condemning city and was on the official records. In so holding the court followed the rule announced in *Mullane v. Central Hanover Tr. Co.,* 339 U S 306, 94 L ed 865, 70 S Ct 652, to the effect that, if feasible, notice must reasonably be calculated to inform parties of proceedings which may directly and adversely affect their legally protected interests." p. 453.

*Pierce v. Board of County Commissioners,* 200 Kan. 74, 434 P.2d 858 (1967), was another tax foreclosure case in which publication service came under attack. In discussing the rule of *Mullane,* the court stated:

"In our opinion these facts bring this case fairly within the rule of *Mullane v. Central Hanover Tr. Co.,* 339 U.S. 306, 94 L.Ed. 865, 70 S.Ct. 652. The defendant in *Mullane* was trustee of a common trust in which many small trust estates were pooled in one fund for investment administration. Some months after the trust was established, the trustee petitioned for approval of its account as the common trustee, giving notice of the hearing to be held thereon, by publication in a local paper, which strictly complied with the requirements of the New York statute.

"Mullane, as special guardian, appeared specially objecting that the notice given and the provisions for giving notice were inadequate to afford due process to the beneficiaries under the Fourteenth Amendment. It appears that the trustee had on its books the names and addresses of the beneficiaries represented by Mullane, and had been able to give notice by mail to the beneficiaries who were known at the time the trust was established.

"Under these circumstances the Supreme Court overruled the constitutional objections interposed to the publication notice as to those beneficiaries whose

interests or addresses were unknown to the trustee. However, as to known beneficiaries the court said:

'As to known present beneficiaries of known place of residence, however, notice by publication stands on a different footing. Exceptions in the name of necessity do not sweep away the rule that within the limits of practicability notice must be such as is reasonably calculated to reach interested parties. Where the names and post-office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency.' (p. 318.)

"In the course of its opinion, the court said that due process of law at a minimum requires 'that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case' (p. 313) and, continuing in the same vein, the court spoke in the following language:

'But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. . . .' (p. 315.)" 200 Kan. at 82-82.

K.S.A. 60-307(d) requires that an affidavit by one of the parties to the action or the parties' attorney must be filed setting forth specific facts as to why service by publication is necessary. We note that the new juvenile code adopted by the 1982 legislature and effective January 1, 1983 (S.B. 520), requires that a person seeking service by publication in a juvenile proceeding must file an affidavit setting forth that a reasonable, but unsuccessful, effort has been made to ascertain the names and/or residences of the persons upon whom publication service is desired.

Cases from other jurisdictions also support the rule that mere publication service without a showing of necessity is insufficient to support an order severing parental rights.

*In Re Beebe,* 40 Cal. App. 3d 643, 115 Cal. Rptr. 322 (1974), was an action to declare a four-year-old free of the custody and control of her father. The petition filed in the case alleged that the father had abandoned his child and further alleged that the address of the father was "unknown." Based upon this allegation, the court authorized publication service. Later the father, having found out about the proceedings, attacked the adequacy of the showing to support the publication service. The California statute authorized publication service upon the filing of an affidavit alleging that the parent could not be served in another manner and that reasonable diligence had been used to effect actual service. The court held:

"In a proceeding to declare a minor child free from the custody and control of her father, the mere allegation that the father's address was unknown was

inadequate to support an order for service of notice on him by publication. A parent has a constitutional right to notice of such proceeding, and while a strict and literal reading of Civ. Code, § 235, could arguably require the court to order service by publication on the mere conclusory allegation that the father's place of residence was unknown, that construction would fly in the face of the obvious legislative effort to comport with due process in the service of both summons and citation, and the statute should therefore be construed to require a showing of due diligence to locate and serve the parent as a prerequisite to an order for service on him by publication." pp. 643-644.

The Georgia Court of Appeals in a consolidated case, *In The Interest of: J.B.,* 140 Ga. App. 668, 231 S.E.2d 821 (1976), had before it the question of whether a putative father whose whereabouts are unknown may have parental rights severed based upon service by publication. In both cases the children were illegitimate and it was alleged that the whereabouts of the fathers were unknown. The trial court held that personal service on the fathers was necessary but the Court of Appeals reversed, stating that under a proper factual showing of reasonable diligence to locate and serve the fathers, publication service would be sufficient. The court stated:

"Whether publication notice is permissible here necessarily depends upon an investigation of whether the whereabouts of the fathers of J.B. and A.D.S. were unknown and whether they could be found with reasonable diligence. *Oakley v. Anderson,* 235 Ga. 607 (221 SE2d 31). As a consequence, the factual support necessary to a determination of the appropriateness of notice by publication in these cases is lacking and it cannot be said without further development of the record whether publication was here permissible." p. 674.

In *Lutheran Social Services of N.J. v. Doe,* 172 N.J. Super. 343, 411 A.2d 1183 (1979), the mothers of two illegitimate children refused to reveal the identities of the putative fathers in two combined severance proceedings. In approving service by publication on the unknown fathers, the court stated that service by publication is not generally favored and is only permitted after a showing that diligent inquiry has failed to locate the defendant.

Similar results requiring a factual showing of due diligence before publication service is valid in a juvenile or severance proceeding are found in *In Interest of T.B.,* 65 Ill. App. 3d 903, 382 N.E.2d 1292 (1978); *Tammie v. Rodriquez,* 570 P.2d 332 (Okla. 1977); and *In Re One Minor Child,* 411 A.2d 951 (Del. 1980).

While it is universally recognized that service by publication under certain factual circumstances will satisfy the constitutional

requirements of due process, we hold that in a severance proceeding it must be affirmatively shown that the party seeking such service exercised due diligence in attempting to identify and locate the parent upon whom such service is desired. If such investigation discloses the whereabouts of the absent parent, then service of summons must be effected in one of the other ways provided in K.S.A. 38-810a so that such parent may receive actual notice of the proceeding. In *Mullane v. Central Hanover Tr. Co.,* 339 U.S. 306, 94 L.Ed. 865, 70 S.Ct. 652 (1950), the United States Supreme Court stated:

"It would be idle to pretend that publication alone, as prescribed here, is a reliable means of acquainting interested parties of the fact that their rights are before the courts." 339 U.S. at 315.

We do not question the validity of publication service under proper circumstances, but fundamental due process requires a factual showing that, after the exercise of reasonable diligence, other service calculated to give actual notice to the party sought to be served is not practical. In the instant case, the record is totally lacking of any showing of the effort made to ascertain the address of Steve Woodard so that actual service might have been had upon him. We will not here attempt to establish the scope or type of effort which might be considered the minimum requirements for a showing of due diligence and, hence, due process. Each case must rest upon its own particular facts. However, if an appellate court is to grant meaningful review the record should contain the facts upon which the determination to seek publication service was based and the trial court should include sufficient findings of fact to support its conclusion that due diligence was exercised.

One other matter complicates our decision in this case. We are advised in the briefs and were told at argument that a final decree of adoption of Eva Woodard by Mr. and Mrs. Nowak was entered on the 20th day of October, 1980. Apparently that judgment has not been appealed and there is no showing what notice, if any, Steve Woodard received of the adoption proceedings. While the record before us fails to show the necessary requirements to support the publication service in this case and therefore fails, on its face, to show that Woodard has been afforded his constitutional right to due process of law, it would cause unnecessary hardship to formally set aside the judgment severing parental rights prior to a rehearing. The apparent defect in service may

not, in fact, exist if it is determined that the necessary requirements for valid publication service were met. Therefore, we are remanding this case to the district court with directions that a hearing be held, after notice to appellant, to determine whether, in fact, the State exercised due diligence in its attempts to locate appellant prior to seeking publication service. If a factual determination discloses that the State did exercise such diligence, then publication service was proper and appellant has, in fact, been afforded due process and the order of severance was proper. If, on the other hand, it is determined that publication service was improper then the court should proceed to hear the matter on the merits and determine whether there is clear and convincing evidence to support a severance of parental rights. If not, the order of severance must be set aside. *Santosky v. Kramer*, _____ U.S. _____, 71 L.Ed.2d 599, 102 S.Ct. 1388 (1982).

The judgment of the trial court is reversed and the case is remanded for further proceedings consistent with this opinion.

SCHROEDER, C.J. and MCFARLAND, J. dissenting.